SLR:LDM:WJG
F#: 2012V02219

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

               Plaintiff,

     - against -

APPROXIMATELY FIVE HUNDRED SIXTY-SEVEN
THOUSAND NINE HUNDRED NINETY DOLLARS AND
ZERO CENTS IN UNITED STATES CURRENCY
($567,990.00) SEIZED FROM CAPITAL ONE BANK
SAFE DEPOSIT BOX NUMBERS 55 AND 315, HELD IN
THE NAMES OF HARRY PATEL AND RITA PATEL,
LOCATED AT 313 STATE STREET, PERTH AMBOY,
NEW JERSEY, AND ALL PROCEEDS TRACEABLE
THERETO;

APPROXIMATELY THREE HUNDRED FORTY-EIGHT
THOUSAND EIGHT HUNDRED NINETY DOLLARS
AND ZERO CENTS IN UNITED STATES CURRENCY
($348,890.00) SEIZED FROM SANTANDER BANK SAFE
DEPOSIT BOX NUMBER 1807, HELD IN THE NAME OF
RITA PATEL, LOCATED AT 210 SMITH STREET,
PERTH AMBOY, NEW JERSEY, AND ALL PROCEEDS
TRACEABLE THERETO;

APPROXIMATELY FORTY-TWO THOUSAND SEVEN
HUNDRED TWENTY-SIX DOLLARS AND ZERO
CENTS ($42,726.00) IN UNITED STATES CURRENCY
SEIZED FROM 22 LYLE PLACE, EDISON, NEW
JERSEY, AND ALL PROCEEDS TRACEABLE
THERETO;

APPROXIMATELY THIRTY THOUSAND FOUR
HUNDRED SIX DOLLARS AND ZERO CENTS
($30,406.00) IN UNITED STATES CURRENCY SEIZED
FROM SHAYONA PHARMACY LOCATED AT 147
SMITH STREET, PERTH AMBOY, NEW JERSEY, AND
ALL PROCEEDS TRACEABLE THERETO;

VERIFIED
COMPLAINT IN REM

CHEN, J.

THE REAL PROPERTY AND PREMISES LOCATED
AT 22 LYLE PLACE, EDISON, NEW JERSEY; and

THE REAL PROPERTY AND PREMISES LOCATED
AT 147 SMITH STREET, PERTH AMBOY, NEW
JERSEY;

Defendants In Rem.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiff, United States of America, by its attorney, LORETTA E. LYNCH, United

States Attorney for the Eastern District of New York, WILLIAM J. GULLOTTA, Assistant

United States Attorney, of counsel, alleges upon information and belief as follows:

## PRELIMINARY STATEMENT

1.     This civil action seeks to forfeit and condemn to the use and benefit of the United

States the above-captioned Defendants in rem, described in further detail below, as well as all

proceeds traceable thereto, pursuant to 21 U.S.C. § 881(a)(6) and 21 U.S.C. § 881(a)(7).

## JURISDICTION AND VENUE

2.     This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

3.     Venue lies in the Eastern District of New York pursuant to 28 U.S.C. §§ 1355 and

1395, in that acts or omissions giving rise to the forfeiture occurred in the Eastern District of New

York.

## DEFENDANTS IN REM

4.     The above-captioned defendant funds (the "Defendant Funds") are comprised of

(a) approximately $567,990.00 in United States currency seized on or about December 18, 2013

from Capital One Bank safe deposit box numbers 55 and 315 located at 313 State Street, Perth

Amboy, New Jersey; (b) approximately $348,890.00 in United States currency seized on or about

December 18, 2013 from Santander Bank safe deposit box number 1807 located at 210 Smith

2

Street, Perth Amboy, New Jersey; (c) approximately $42,726.00 in United States currency seized on or about December 17, 2013 from 22 Lyle Place, Edison, New Jersey; and (d) approximately $30,406.00 in United States currency seized on or about December 17, 2013 from the Shayona Pharmacy ("Shayona") at 147 Smith Street, Perth Amboy, New Jersey.   This action seeks to forfeit and condemn to the United States the Defendant Funds in accordance with 21 U.S.C. § 881(a)(6), as moneys or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of the Controlled Substances Act (the "CSA"), and all proceeds traceable to such an exchange, and as moneys used or intended to be used to facilitate any violation of the CSA.

5.      The above-captioned defendant properties (the "Defendant Properties') are comprised of the real property and premises located at (a) 22 Lyle Place, Edison, New Jersey (the "Bhatt Residence"); and (b) 147 Smith Street, Perth Amboy, New Jersey (the "Shayona Property").   This action seeks to forfeit and condemn to the United States the Defendant Properties in accordance with 21 U.S.C. § 881(a)(7), as real property, including any right, title, and interest (including leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of the CSA punishable by more than one year's imprisonment.

## STATUTORY BACKGROUND

6.      Pursuant to 21 U.S.C. § 841(a)(1), "[i]t shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense or possess with intent to manufacture, distribute, or dispense, a controlled substance," except as authorized under the CSA.

7.      Pursuant to 21 U.S.C. §§ 829(a) and (b), controlled substances may not be

dispensed without a prescription.   Accordingly, pharmacists are required by law to comply with

the relevant rules and regulations prescribed thereunder, including 21 C.F.R. § 1306.04(a), which

provides in relevant part that "[a] prescription for a controlled substance to be effective must be

issued for a legitimate medical purpose by an individual practitioner acting in the usual course of

his professional practice."   See 21 C.F.R. § 1306.04(a).   The regulation further provides that

"[a]n order purporting to be a prescription issued not in the usual course of professional treatment

or in legitimate and authorized research is not a prescription within the meaning and intent of [21

U.S.C. § 829] and the person knowingly filling such a purported prescription . . . shall be subject to

the penalties provided for violations of the provisions of law relating to controlled substances."

8.      Pursuant to 21 U.S.C. § 812, Oxycodone is a Schedule II controlled substance.
The prohibitions contained in 21 U.S.C. § 841(a)(1) apply to registered practitioners, including
medical doctors and pharmacists.

9.      Pursuant to 21 U.S.C. § 881(a)(6), all moneys, negotiable instruments, securities,
or other things of value furnished or intended to be furnished by any person in exchange for a
controlled substance or listed chemical in violation of the CSA, all proceeds traceable to such an
exchange, and all moneys, negotiable instruments, and securities used or intended to be used to
facilitate any violation of the CSA are subject to forfeiture to the United States.

10.     Pursuant to 21 U.S.C. § 881(a)(7), all real property, including any right, title, and
interest (including leasehold interest) in the whole of any lot or tract of land and any appurtenances
or improvements, which is used, or intended to be used, in any manner or part, to commit, or to
facilitate the commission of, a violation of the CSA punishable by more than one year's
imprisonment is subject to forfeiture to the United States.

4

## THE INVESTIGATION

11.     In or about December 2011, detectives from the Waterfront Commission of New York and New Jersey ("Waterfront Commission") discovered that an employee at the New York Container Terminal in Staten Island, New York, was involved in the purchase, sale, and possession of various controlled substances, primarily Oxycodone.

12.     An investigation by the Waterfront Commission, the New York City Police Department ("NYPD"), the Richmond County District Attorney's Office ("SI-DA"), and the Department of Homeland Security, Immigration and Customs Enforcement ("ICE") revealed a conspiracy to distribute prescription medication, primarily Oxycodone, involving the following individuals: Dr. Mihir Bhatt ("Bhatt"), a medical doctor practicing primarily in Staten Island; Dr. Thomas Dinardo ("Dinardo"), a chiropractor; Rita Patel ("Patel"), a pharmacist and owner of the Shayona Pharmacy ("Shayona") in Perth Amboy, New Jersey; and several members of the International Longshoremen's Association ("ILA") working at the New York Container Terminal in Staten Island.

13.     Throughout the course of the investigation, multiple eavesdropping warrants were obtained that authorized law enforcement personnel to listen to telephone calls placed or received by several telephone numbers associated with members of the conspiracy.   In addition to the interception of telephone calls and text messages, law enforcement agents established video and audio surveillance at the New York City Wellness Center ("Wellness Center"), which is located at 4870 Hylan Boulevard, Staten Island, New York , and at other locations in New York and New Jersey.   Bhatt practiced out of the Wellness Center, among other locations.

14.     As discussed below, the surveillance revealed that Bhatt issued prescriptions without a legitimate medical purpose, and that Patel fulfilled a disproportionately large volume of

5

Bhatt's prescriptions, usually for Oxycodone, at Shayona.   As also discussed below, the use of an undercover agent confirmed that Bhatt and Patel conspired to unlawfully prescribe and dispense controlled substances.

**Bhatt Issued Prescriptions for Controlled Substances Without A Legitimate Medical Purpose**

15.     During the course of the investigation, law enforcement agents discovered that Bhatt and Dinardo prescribed controlled substances, primarily Oxycodone, to a disproportionately large number of patients at the Wellness Center and other locations in New York City and New Jersey.   For example, over a two-year period from 2011 through 2013, Bhatt issued 11,600 prescriptions for Oxycodone.

16.     The investigation revealed that these prescriptions were dispensed without performing a proper medical examination to determine whether the medications were needed for a legitimate medical purpose.   Bhatt and Dinardo profited from the scheme by billing the purported patients' insurance companies for services that were not medically necessary and/or never performed.   In addition to charging the insurers, Bhatt also received cash payments directly from his purported patients for the invalid prescriptions.   Patel profited from the scheme by charging the purported patients for the fulfillment of the invalid prescriptions for Oxycodone and other controlled substances.   Notably, many of Bhatt's purported patients participated in this scheme in order to obtain Oxycodone and other highly addictive painkillers for their own improper use and/or to illegally distribute the medication to others.

17.     The investigation further revealed that many of Bhatt's purported patients traveled considerable distances to visit Bhatt and obtain prescriptions specifically from him instead of visiting local doctors closer to their homes.   They traveled this distance because they knew that

6

during these visits, Bhatt would perform cursory or no medical examinations at all and then provide them with the prescriptions for controlled substances, such as Oxycodone, that they wanted even though they had no medical need for the prescription.

18.     As video surveillance revealed, initial and follow-up visits with Bhatt were cursory and failed to meet the standard of generally accepted medical practice.

19.     For example, from in or about January 2010 through in or about November 2012, Bhatt provided approximately fifty-six (56) prescriptions for Oxycodone to "Patient 1" without performing a proper examination of Patient 1 to determine whether or not the medication was medically necessary.   Indeed, Patient 1 often was not even physically present at the Wellness Center when Patient 1 obtained his/her prescriptions.   Instead, Bhatt simply wrote out prescriptions for the highly-addictive pain killer and arranged to have the prescriptions delivered to Patient 1.   On each of these occasions, Bhatt conducted no examination of Patient 1.

20.     On multiple occasions, Bhatt's purported patients visited Bhatt at the Wellness Center or one of his other offices and presented a list of the names of individuals who requested prescriptions for Oxycodone or other controlled substances.   Bhatt then wrote prescriptions for the individuals named on the list without meeting or speaking to them to determine whether or not the prescriptions were necessary and gave the stack of prescriptions to the purported patients.

21.     Despite having to travel long distances, the purported patients who received prescriptions for Oxycodone from Bhatt returned to his office for new prescriptions regularly and often because they were abusing their medication and/or selling it to others who did not have a prescription.   The purported patients traveled to see Bhatt because they knew he was willing to issue prescriptions without a legitimate medical purpose.

22.     In an effort to conceal the fact that there was no legitimate medical purpose for the

prescription, Bhatt sometimes coached his purported patients on how to falsely describe their medical conditions in order to justify their prescriptions.

23.     Furthermore, after providing prescriptions to his purported patients without performing an appropriate medical examination, Bhatt fraudulently billed multiple insurance companies for examinations and other services that were never rendered.   During the course of the investigation, Bhatt also manipulated patient files by using false information in order to fabricate a justification for his prescription of Oxycodone or another medication.   Bhatt then submitted false bills to the insurance companies of the purported patients.   For those purported patients who were not insured, Bhatt charged them fees, to be paid in cash, for the invalid prescriptions.

24.     In addition to the use of audio and video surveillance equipment at various locations associated with Bhatt's practice, including the Wellness Center, the investigation involved the use of an undercover law enforcement agent ("UC-1").   During the course of this investigation, UC-1 met with Bhatt on several occasions and received prescriptions for Oxycodone.   On each occasion, Bhatt failed to perform an adequate examination of UC-1, and instead simply wrote a prescription for Oxycodone without determining whether it was medically appropriate.

25.     For example, on or about November 22, 2013, UC-1 went to Bhatt's office at 456 Arlene Street, Staten Island, New York for an appointment with Bhatt.   UC-1 told Bhatt that he would be going on a three-week vacation and therefore needed a prescription for more Oxycodone pills than he typically receives.   After Bhatt issued a prescription for forty-five Oxycodone pills, Bhatt instructed UC-1 to go to Bhatt's residence at 22 Lyle Place, Edison, New Jersey, on the following Tuesday for a prescription for an additional sixty pills of oxycodone.   Bhatt performed

no medical examination during this appointment, which lasted approximately three-minutes.

26.     From in or about July 2013, through in or about December 2013, UC-1 had similar weekly visits with Bhatt during which Bhatt prescribed Oxycodone and/or other controlled substances to UC-1.   During each of these visits, Bhatt performed perfunctory or no physical examination of UC-1 to determine whether or not it was appropriate to prescribe medication to UC-1.   Bhatt also billed UC-1's insurance company for services that were not rendered, including but not limited to nerve-related tests such as electromyogram tests.

27.     Bhatt received warnings by other medical professionals that his purported patients were visiting and receiving similar prescriptions from other doctors, yet Bhatt continued to see as many purported patients as possible and write prescriptions for controlled substances because it generated a high volume of fraudulent insurance billings as well as cash payments directly to Bhatt.

28.     As a result of Bhatt's fraudulent billing practices, multiple insurance carriers paid Bhatt hundreds of thousands of dollars, if not more, for services that were never rendered.   Bhatt also received thousands of dollars in cash as a result of this scheme.

**Patel's Fulfillment of the Invalid Prescriptions Issued by Bhatt**

29.     Bhatt worked closely with Patel, the owner of Shayona, to ensure that his purported patients received the controlled substances he prescribed.   Shayona, which as noted is located in New Jersey, routinely filled the excessively large volume of Oxycodone and other controlled substance prescriptions issued by Bhatt in Staten Island.

30.     Conversations that were intercepted during the course of the investigation reveal that Patel discussed with Bhatt the best strategy for writing prescriptions in a way that would ensure coverage by the insurance companies and/or prevent the relevant regulatory and law

9

enforcement agencies from detecting their scheme.  For example, on multiple occasions during

the course of the investigation, Bhatt and Patel spoke on the telephone about which dosage of

Oxycodone Bhatt should prescribe to his patients.  Patel cautioned Bhatt about writing

prescriptions for 30-mg doses of Oxycodone because she believed that that dosage would attract

suspicion or scrutiny by insurance companies and/or law enforcement.

31.     Patel's role in the scheme was lucrative, and it resulted in a significant increase in

sales of Oxycodone at Shayona.  Her willingness to dispense large amounts of Oxycodone

pursuant to Bhatt's prescriptions, despite numerous red flags and warning signs, attracted Bhatt's

purported patients to Shayona from far and wide.  Indeed, some of Bhatt's purported patients

drove considerable distances – approximately ten miles or more from Brooklyn to Staten Island

and then to New Jersey – to get their prescriptions from Bhatt and their pills from Patel at Shayona,

despite the fact that there were a great number of other doctors and pharmacies much closer to their

homes.

32.     Because the demand was so high, Patel routinely charged additional cash payments

in exchange for the controlled substances she dispensed.  For example, when Patel filled the

prescriptions written by Bhatt, she charged the purported patients' insurance companies for the

cost of the medication.  On top of the insurance, Patel also required Bhatt's purported patients to

make additional cash payments to her ("upcharges"), over and above their copayments, even

though this practice is prohibited by most insurance policies.  The investigation revealed that the

upcharges demanded by Patel ranged from $20 to approximately $150 depending on the dosage

and quantity of medication the she dispensed.  This practice continued throughout the

investigation and is believed to have generated hundreds of thousands of dollars in cash for Patel.

33.     In addition, on at least one occasion during the course of the investigation, UC-1's

insurance company refused to pay for an Oxycodone prescription issued by Bhatt and presented to Patel at Shayona because UC-1 had filled a prescription for Oxycodone the previous day.   As a result, instead of asking UC-1 to wait the required number of days before filling the new prescription, Patel simply required UC-1 to pay cash for the full amount of the prescription.

34.     The investigation revealed a dramatic increase in sales of Oxycodone by Shayona dating back to 2006.   For example, in 2006, Shayona sold approximately 90,000 Oxycodone pills, placing it approximately fifth among retail pharmacies in the area of zip code 08861.   By 2008, Shayona increased its inventory to approximately 200,000 Oxycodone pills.   In 2009, Shayona ordered approximately 450,000 Oxycodone pills, and in 2010 it ordered approximately 800,000 Oxycodone pills, making Shayona the largest dispenser of Oxycodone in its area.   Indeed, in 2010 Shayona ordered more Oxycodone than the Santa Maria Pharmacy, Edison Drugs & Surgical, Cedeno's Pharmacy, Rite Aid of New Jersey, Manger Pharmacy, Ludwigs Pharmacy, Pathmark, Community Pharmacy, Shop Rite, and Supremo combined.   By 2011, when this investigation began, Shayona increased its purchase of Oxycodone to 900,000 pills, more than double the amount ordered by the pharmacy with the second-largest order of Oxycodone pills in the region.

35.     As Patel's unlawful distribution of Oxycodone grew in volume and profit, Patel sought Bhatt's assistance in qualifying for authority to acquire an unlimited volume of Oxycodone from a pharmaceutical distributer.

### THE SEIZED FUNDS

36.     As described above, Patel's and Bhatt's participation in this scheme generated a significant amount of proceeds, including a considerable amount of cash as a result of the upcharges and other cash payments Patel and Bhatt demanded from Bhatt's purported patients.

37.     Based on the investigation, on or about December 17, 2013, law enforcement

11

officials executed a search warrant issued by The Honorable Bradley J. Ferencz, New Jersey State Criminal Court Judge, authorizing the search of several safe deposit boxes associated with Patel. Pursuant to this warrant, law enforcement agents seized approximately $567,990.00 in United States currency from Capital One Bank safe deposit box numbers 55 and 315 located at 313 State Street, Perth Amboy, New Jersey, and approximately $348,890.00 in United States currency from Santander Bank safe deposit box number 1807 located at 210 Smith Street, Perth Amboy, New Jersey.

38.     Patel maintains several bank accounts at multiple financial institutions, yet she kept approximately $924,000 in the safe deposit boxes referenced above.

39.     Safe deposit boxes are often used to conceal large amounts of criminally-derived proceeds to avoid any record of the cash being deposited in an account where it might draw the attention of law enforcement.   For example, pursuant to 31 U.S.C. § 5313, large deposits of cash into bank accounts at financial institutions may be subject to legal reporting requirements.   As such, criminals prefer to conceal criminally-derived proceeds in safe deposit boxes in order to avoid these reporting requirements and the potential for detection by law enforcement, even though the money could otherwise earn interest if deposited into an account and many banks prohibit the storage of cash in safe deposit boxes.

40.     Pursuant to other search and seizure warrants, law enforcement seized approximately $42,726.00 in United States currency from Bhatt's residence at 22 Lyle Place, Edison, New Jersey, where as noted above, Bhatt issued invalid prescriptions.   Law enforcement also seized approximately $30,406.00 in United States currency from the Shayona Pharmacy at 147 Smith Street, Perth Amboy, New Jersey.

12

## 22 LYLE PLACE, EDISON, NJ 08820

41.     Bhatt owns the real property and premises located at 22 Lyle Place, Edison, New

Jersey.

42.     In order to cater to his patients who desired Oxycodone and other controlled

substances, Bhatt issued invalid prescriptions from his residence at 22 Lyle Place, Edison, New

Jersey.   Bhatt's practice at his residence was consistent with his practice at his offices in that he

issued prescriptions for controlled substances without performing any examination to determine if

the prescriptions were necessary.

43.     For example, on or about August 29, 2013, UC-1 visited Bhatt at 22 Lyle Place and

received a prescription for Oxycodone.   Bhatt did not perform any examination of UC-1, but

nevertheless prescribed 30 doses of Oxycodone.

44.     On or about November 26, 2013, UC-1 went to Bhatt's home at 22 Lyle Place in

Edison, New Jersey for an appointment with Bhatt, and met with Bhatt inside his home office.

While there, UC-1 observed two individuals sitting in a parked Jeep Cherokee in Bhatt's driveway.

Bhatt asked UC-1 to wait inside, and then Bhatt carried two prescriptions to the Jeep parked in his

driveway.   UC-1 then observed Bhatt hand the prescriptions to one of the two individuals in the

Jeep prior to returning to his house.   Bhatt then returned to his residence and issued UC-1 a

prescription for sixty Oxycodone pills.   UC-1's visit with Bhatt ended approximately six minutes

after Bhatt let UC-1 into his residence, and no physical examination was conducted.

45.     Moreover, on approximately fifteen occasions during the course of the

investigation, other purported patients met Bhatt at his home at 22 Lyle Place to receive

prescriptions from Bhatt for one or more controlled substances.   On each of these occasions,

Bhatt knowingly issued invalid prescriptions without conducting any examinations.   Clearly, this

practice was not in good faith, was outside the course of a professional practice, and was not in accordance with generally accepted standards of medical practice, and therefore was in violation of the CSA.

## 147 SMITH STREET, PERTH AMBOY, NEW JERSEY

46.     As discussed above, Patel filled the invalid prescriptions issued by Bhatt at Shayona, which is located at 147 Smith Street in Perth Amboy, New Jersey.   As also discussed above, Shayona became by far the largest dispenser of Oxycodone in its area, without a close second.

## THE INDICTMENTS

47.     For their respective roles in the above-described conspiracy to unlawfully distribute Oxycodone and other controlled substances, on or about December 13, 2013, Bhatt, Patel, Bhatt's medical practice, and the Shayona Pharmacy were charged by a grand jury in Richmond County, New York with multiple felony violations, including but not limited to Criminal Sale of a Prescription for a Controlled Substance (NY PL 220.65); Conspiracy in the Third Degree (NY PL 105.13) (conspiracy to sell prescriptions for a controlled substance); Conspiracy in the Fifth Degree (PL 105.05-1) (conspiracy to commit felonies of Insurance Fraud in the Third and Fourth Degrees, Grand Larceny in the Third Degree, and Falsifying Business Records in the First Degree); Insurance Fraud in the Second, Third and Fourth Degrees (PL Art. 176); Grand Larceny in the Third Degree (PL 155.35-1); Falsifying Business Records in the First Degree (PL 175.10); Offering a False Instrument for Filing in the First Degree (PL 175.35); Enterprise Corruption (PL 460.20-1-a); and Scheme to Defraud in the First Degree (PL 190.65-1-b).

14

## FIRST CLAIM FOR RELIEF

48.     Plaintiff repeats the allegations of paragraphs 1 through 47 as if fully set forth herein.

49.     The Defendant Funds constitute moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of the CSA, proceeds traceable to such an exchange, and/or moneys, negotiable instruments, or securities used or intended to be used to facilitate a violation of the CSA.

50.     As a result, the Defendant Funds are subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

## SECOND CLAIM FOR RELIEF

51.     Plaintiff repeats the allegations of paragraphs 1 through 47 as if fully set forth herein.

52.     The Defendant Properties constitute properties that were used, or intended to be used, to commit, or to facilitate the commission of, violations of the CSA that are punishable by more than one year's imprisonment.

53.     As a result, the Defendant Properties are subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(7).

WHEREFORE, Plaintiff requests that a warrant of this Court be issued for the arrest of the Defendants in rem; that due notice of these proceedings be given to all interested persons; that the Defendants in rem be forfeited and condemned to the use of the United States of

America; that the Plaintiff be awarded its costs and disbursements in this action; and for such other and further relief as this Court deems just and proper.

Dated: Brooklyn, New York
     June 2, 2014

LORETTA E. LYNCH
UNITED STATES ATTORNEY
Attorney for Plaintiff
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By: _____
William Gullotta
Assistant United States Attorney
(718) 254-6148

16

## VERIFICATION

1.      I am a Task Force Officer with the Department of Homeland Security,

Homeland Security Investigations ("HSI") and, as such, have knowledge of the facts underlying

this action.

2.      I have read the within verified complaint in rem and know the contents

thereof.

3.      The matters contained in the within verified complaint in rem are true and

accurate to the best of my knowledge, information and belief.

4.      The source of my information and the grounds for my belief are my

personal knowledge, information provided by other law enforcement officers, and the official files

and records of the DHS and other law enforcement agencies.

I declare under penalty of perjury that the foregoing is true, to the best of my

knowledge, information, and belief.

Dated: Brooklyn, New York
       June 2, 2014


_____
Paul Shimborske
Task Force Officer
Homeland Security Investigations

17